UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x

DERYCK HAREWOOD,

                Plaintiff,

                v.

DETECTIVE MICHAEL BRAITHWAITE,

                Defendant.

----------------------------------------------------------x

**MEMORANDUM & ORDER**
09-CV-2874 (PKC) (RML)

PAMELA K. CHEN, United States District Judge:

       Plaintiff Deryck Harewood brought this action against the City of New York (the "City"),

New York City Police Department ("NYPD") Detective Michael Braithwaite and an unidentified

NYPD officer ("John Doe"), asserting claims under 42 U.S.C. § 1983 ("§ 1983"), the New York

State Constitution, and New York common law.  After Plaintiff's claims against the City and

John Doe were dismissed, trial proceeded against Braithwaite on Plaintiff's claims of false arrest,

malicious prosecution, and unreasonable detention.  After a six-day trial, the jury determined that

Braithwaite had falsely arrested and unreasonably detained Harewood, and awarded Harewood

$25,000 in compensatory damages.  In addition, the jury awarded punitive damages against

Braithwaite in the amount of $20,000 on Harewood's false arrest claim and an additional

$20,000 on his unreasonable detention claim.  Braithwaite now moves, with respect to each

claim, (1) for judgment as a matter of law on the issues of liability and qualified immunity

pursuant to Rule 50 of the Federal Rules of Civil Procedure ("FRCP") or, in the alternative, (2)

for a new trial pursuant to FRCP Rule 59 or to vacate the punitive damages award.  For the

reasons set forth below, Braithwaite's motion for a judgment as a matter of law is denied with

respect to the false arrest verdict, granted with respect to the unreasonable detention verdict, and denied with respect to the request for a new trial and to vacate the punitive damages award. The jury's award of $25,000 in compensatory damages and $20,000 in punitive damages for Plaintiff's false arrest claim stands; the Court overturns the award of $20,000 in compensatory damages for Plaintiff's unreasonable detention claim.

## BACKGROUND

The Court assumes the parties' familiarity with the procedural history of this case and the trial record, and discusses them only to the extent they are relevant to the resolution of the instant motions.

### I.      History of the Case

Plaintiff's claims arise out of his June 11, 2007 arrest by Braithwaite and the subsequent no true bill vote by the Grand Jury. (*See* Dkt. 1 ("Compl.").) On July 9, 2009, Plaintiff initiated this action under § 1983 and State law, asserting claims of false arrest, malicious prosecution, and unreasonable detention against the City, Braithwaite, and John Doe. (*Id.*)

On July 12, 2011, defendants the City of New York, Braithwaite, and John Doe moved for summary judgment. (Dkt. 29.) In a Memorandum and Order dated February 10, 2012, the Honorable Frederic Block, then-presiding,[1] granted the City's and John Doe's motions for summary judgment with respect to both Harewood's federal and State law claims.[2] In addition, Judge Block granted Braithwaite's motion for summary judgment as to Harewood's State law

---

[1] This case was reassigned to the undersigned on April 18, 2013.

[2] Harewood's claims against the John Doe Officer were dismissed because Harewood made no attempt to learn John Doe's identity during discovery. (Dkt. 39 ("SJ. Op.") at 3-4.) The Court granted the City's motion for summary judgment on Harewood's *Monell* claim because Harewood failed to allege that any municipal policy or practice caused his constitutional rights to be violated. (*Id.* at 4.)

claims, but denied it as to Harewood's § 1983 claims for false arrest, malicious prosecution, and unreasonable detention. For largely the same reasons that he denied Braithwaite's motion for summary judgment, Judge Block also held that there were genuine disputes of material fact that prevented him from determining whether Braithwaite was entitled to qualified immunity as a matter of law. (SJ. Op. at 10); *see also Harewood v. City of New York*, 508 F. App'x 60, 61 (2d Cir. 2013) ("The district court in essence held that there were genuine disputes of material fact that prevented it from determining that Braithwaite was entitled to qualified immunity as a matter of law.").

Braithwaite filed an interlocutory appeal, arguing that he was entitled to qualified immunity on all three § 1983 claims. *Harewood*, 508 F. App'x at 61. The Second Circuit rejected the appeal, finding that although the Circuit has jurisdiction to hear an interlocutory appeal to determine whether qualified immunity is established as a matter of law, *id.* at 62 (citing *Bouche v. Oliveri*, 506 F. App'x 29, 31 (2012)), it does not have such jurisdiction to resolve factual disputes or determine whether they are genuine, *id.* (citing *Bolmer v. Oliveira*, 594 F.3d 134, 140-41 (2d Cir. 2010)). Accordingly, on January 25, 2013, the Circuit declined to exercise interlocutory jurisdiction over the Court's denial of qualified immunity on Harewood's claims because material facts were in dispute. *Id.* at 63. By mandate dated February 21, 2013, the Court of Appeals remanded the case to this Court for further proceedings. (Dkt. 45.)

After a series of motions and extension requests, trial began on December 2, 2013. [3]

---

[3] The following is a brief procedural history of this case. The parties filed their proposed pretrial order on April 19, 2013. Thereafter, the City, as part of its Public Service Program, retained outside *pro bono* counsel to represent Braithwaite in this matter. (Dkt. 49.) The Court held a pretrial conference on May 22, 2013. There, the parties jointly agreed to reopen discovery to exchange expert discovery and conduct purportedly key depositions that had not been taken previously. Following a series of motions, including Plaintiff's motion to unseal the Grand Jury minutes from his underlying criminal case and Defendant's motion to compel depositions and for

## II. **Evidence at Trial**

A. Factual Overview

On May 17, 2007, at approximately 2:13 p.m., a 23-year old male named Raphael Maximin was stabbed in the vicinity of East 95th Street near Rutland Avenue, Brooklyn, New York. (JT[4] ¶ 1; DX-U[5] at NYC-B 002.) On June 11, 2007, Braithwaite arrested Harewood for committing the stabbing. (JT ¶ 2.) The next day, June 12, 2007, a criminal complaint charged Harewood with Assault in the First, Second and Third Degrees, Attempted Murder in the Second Degree, and Criminal Possession of a Weapon in the Fourth Degree. (*Id.* ¶ 3.) On June 13, 2007, Harewood was arraigned in criminal court, and subsequently incarcerated at Riker's Island. (*Id.* ¶ 4-5.) On June 15, 2007, the criminal charges were presented to a Grand Jury. (*Id.* ¶ 6.) The Grand Jury voted to no true bill, and did not indict Harewood. (*Id.*) On June 16, 2007, Harewood was released on his own recognizance. (*Id.* ¶ 7.) On July 30, 2007, the criminal court dismissed and sealed the charges against Harewood. (*Id.* ¶ 8.)

Plaintiff filed the instant action on July 9, 2009. (Compl.)

---

Harewood's tax returns, the Court resolved the parties' final motions *in limine* on the record at the September 13, 2013 pre-trial conference, as supplemented by the Court's September 23, 2013 Memorandum and Order. *See Harewood v. Braithwaite,* 09-CV-2874 (PKC) (RML), 2013 WL 5366391 (E.D.N.Y. Sept. 23, 2013). After another a series of motions and extension requests primarily relating to Plaintiff's (ultimately successful) motion to unseal the Grand Jury minutes for the Court's *in camera* review, the Court set trial for December 2, 2013.

[4] "JT" refers to the parties' joint stipulation of facts entered into evidence at trial. It is located at Dkt. 124-20.

[5] "DX" refers to Defendant's Trial Exhibits.

B. Plaintiff's Evidence

    1. The Stabbing & Hans Holder's Witness Statement

On May 17, 2007, prior to the stabbing, Maximin was at the apartment of a Ms. Lawner, which was a second floor apartment located at 1028 Rutland Road, Brooklyn, New York. (PX-3.[6]) Hans Holder, a 24-year-old male who subsequently witnessed the stabbing, was present at Ms. Lawner's apartment with three of Holder's friends: the victim (Maximin), Ronald Mars, and Shawn Brathwaite.[7] Ms. Lawner's daughter, Shawana Hibbert, was also present. (PX-3; Tr.[8] 16.) Maximin and his friends were putting up shelving in Ms. Lawner's apartment. (PX-3.) At some point, Mars received a call on his cell phone from Christopher Rodriguez. (*Id*.) Rodriguez stated he was waiting downstairs, and asked Mars to send someone downstairs to open the door. (*Id*.) Maximin went downstairs to meet Rodriguez. (*Id*.) About three minutes later, Mars received another call from Rodriguez, who stated that someone was "messing" with Maximin. (*Id*.)

At that time, Holder ran downstairs to the corner of East 95th Street and Rutland Road. He looked south and saw that a short distance down East 95th Street, three males were engaged in a fight with Maximin. (PX-3; Tr. 40.) Two of the assailants were holding Maximin down and one was standing above him. (PX-3.) In his May 17, 2007 interview with Braithwaite, Holder described the males as follows:

> o Male # 1 (Holding victim down) Black, 5'6", 120 lbs, mid 20's, yellow shirt, dark short pants, and was saying, "Who was it?"

---

[6] "PX" refers to Plaintiff's Trial Exhibits.

[7] There is no evidence that Shawn Braithwaite is related to Defendant.

[8] "Tr." refers to the trial transcript, which is located at Dkt. 126-130.

      o   Male # 2 (Holding victim down) Black, 6'0", 250 lbs, late 20's, white shirt, blue jeans.

      o   Male # 3 (Standing) Black, late 20's, no further description.

(PX-3; Tr. 39-40.)

    2.   Beverly Creary's Witness Statement

On May 17, 2004, at 3:40 p.m., Beverly Creary and her sister, Joset Dell, who worked near the intersection where the incident had taken place, were interviewed by NYPD Detective Dennis Murphy, a colleague of Braithwaite. Creary and Dell both provided recorded statements to Murphy. (PX-2; Tr. 41-43, 465.)[9]

According to Murphy's report, Creary, with some input from Dell, told Murphy that:

- she witnessed "the victim fighting with 3 other boys," *i.e.,* the assailants;

- "the victim's best friend who is always with him was standing there at the time watching and doing nothing";

- she recognized the assailants, whom she referred to as "the boys" because "the boys [were] always hanging out smoking weed" in that particular spot;

- she "thought that [the boys] were play fighting" but "realized it was serious when she saw the victim bleeding and saw the 1 male with a small knife in his hand [and] he was in a punch like movement into the victim[']s stomach area . . . . the other 2 boys with him [were] punching the victim and kicking him";

- with respect to identifying the assailants, "the 1 with the knife was approx. 6' to 6'2" wearing a blue shirt but that he took it off when he left and had a second white shirt on . . . . he had blood on his pants blue jeans and knew it was blood because she could see the wet stain on them";

- "the second boy was wearing [b]rown jeans and a brown shirt and he was covered in blood on his shirt and pants"; and

- she could identify the perpetrators.

(PX-2; Tr. 41-43.)

---

[9] Both Braithwaite and Creary testified at trial. (Tr. 35-126, 182-344 (Braithwaite); 421-544 (Creary).)

3. The Photo Arrays

On May 17, 2007, at approximately 6:30 p.m., Holder was brought to the 67th Precinct to view photos from the Photo Manager database in an effort to identify the relevant parties to the stabbing. (PX-2; Tr. 43-45.) Murphy showed Holder 24 photos of males arrested in the vicinity of the stabbing; Holder made no identification. (Tr. 43-44.) Holder then viewed 1,002 photos of black men aged 20 to 28, between 5'5" and 5'8" who had been arrested in the 67th Precinct since January 1, 2004, and again made no identification. (Tr. 44.) Finally he viewed 761 photos of black men who had been arrested for marijuana possession in the 67th, 71st, or 73rd Precincts since January 1, 2004. (*Id.*) From the final array, Holder positively identified Christopher Rodriguez as the friend of the victim who was present at the stabbing. (Tr. 44-45.) However, Holder did not identify any of the three assailants he had seen. (PX-4.)

One week later, on May 24, 2007, Braithwaite interviewed Creary, at the 67th Precinct. (PX-5; Tr. 47.) Braithwaite showed Creary a stack of photographs of men who had previously been arrested at or near the intersection where the stabbing had occurred. (Tr. 199-200.) An arrest photograph of Harewood was included in the array because on February 10, 2007, a little more than one month prior to Maximin's stabbing, Harewood was arrested in Brooklyn within the jurisdiction of the 67th Precinct for alleged possession of marijuana. (*Id.*) The arrest photograph was accompanied by certain personal data, *i.e.*, that Harewood was 42 years old, 5'6" tall, and weighed 150 pounds at that time. (PX-6.) Creary identified Harewood's photograph as the suspect she had described to Murphy as the "tall black male who was wearing a brown hooded sweatshirt and brown pants whom she observed making a punching motion to the victim's stomach." (Tr. 49-50.) Braithwaite never disclosed to Creary that Harewood was 42 years old, 5'6," or 150 pounds. (Tr. 52.)

Later that day, May 24, 2007, Braithwaite transported Creary to the Kings County District Attorney's Office where she was audiotaped by Assistant District Attorney John Gianotti, and the following exchange occurred:

> [Gianotti]: "So the man in brown, do you see a knife in his hand when he's stabbing or punching in the guy's chest?"
>
> [Creary]: "I just see him punching. I didn't actually see the knife until the blue, the one in the blue I saw the knife."
>
> (Tr. 57.)

### 4. Harewood's June 11, 2007 Arrest

On June 11, 2007, Braithwaite arrested Harewood at his home without a warrant. (Tr. 75, 161; JT ¶ 1.) Braithwaite then transported Harewood to the 67th Precinct police station where he handcuffed Harewood to a pole and interrogated him for several hours. (Tr. 351-52.) During the course of that interrogation, Harewood told Braithwaite, among other things, that on May 17, 2007, Harewood was working for Paul Gibbs at a construction company located at 501 Midwood Street, Brooklyn, New York, about 15 blocks from the place where the stabbing had taken place. (Tr. 353, 366.) Harewood provided Braithwaite Gibbs's name, address and phone number. (*Id.*) Harewood further told Braithwaite that he had nothing to do with Maximin's stabbing and that Braithwaite made a "mistake" by arresting him. (Tr. 359-360.) Harewood testified at trial that he was not near the site of the stabbing on May 17, 2007, and that he did not know Maximin or any other person involved in the stabbing. (Tr. 365, 408-09.)

### 5. Post-Arrest Lineup

Following the interrogation of Harewood, Braithwaite impaneled a lineup in which Creary had the opportunity to identify Harewood as the perpetrator of the stabbing. (Tr. 87, 354.) Even though there was a discrepancy between Harewood's actual height (5'6") and the height of the perpetrator as described by Creary during her initial statement (6'2")—or because

of it, as Plaintiff argued—Braithwaite had the individuals in the lineup sit, rather than stand during the identification procedure, thus preventing Creary from observing Harewood's height. (Tr. 88, 483.)  Further, Braithwaite had the individuals in the lineup wear shower caps so that their hair styles were imperceptible.  (Tr. 88, 483.)  Creary ultimately picked out Harewood, though Plaintiff argued that it was "based on the fact she had seen his mug shot" during the May 24, 2007 interview with Braithwaite.  (Tr. 20).

## C. The Defendant's Evidence

Maximin's stabbing occurred in the middle of the afternoon on May 17, 2007.  (JT ¶ 11.) The attack took place directly in front of Beverly Creary's store, where she was present, had a clear view, and witnessed the attack from a close distance.  (PX-2; Tr. 423, 431.)  Shortly after the attack, Detective Murphy interviewed her.  She told him that she was familiar with the victim and his three attackers from seeing them almost daily in a group that smoked marijuana just across the street from her store.  (PX-2; Tr. 427.)  Creary and/or her sister, Dell, told the police that some of the attackers may have been arrested in the area recently.  (PX-2.)  Creary told the police that she could identify the attackers.  (PX-2; Tr. 189-190.)

Despite expressing concerns over her safety, on May 24, 2007, Creary met with Braithwaite at the 67th Precinct.  (PX-2, 5; Tr. 192-193, 432, 433, 441-442.)  She correctly identified a photograph of the victim.  (PX-5; Tr. 199.)  Detective Braithwaite showed Ms. Creary a stack of photographs of men arrested near the intersection of the crime scene.  (PX-5; Tr. 201.)  From that stack, she identified a photograph of Harewood as the man she had described as having made a punching motion to the victim's stomach, a motion which she subsequently realized—upon seeing him hand off a knife to another attacker—were actually multiple stabbing motions.  (PX-5; Tr. 47-48, 50, 199, 201-02, 441, 445.)

Ms. Creary then agreed to accompany Braithwaite to the District Attorney's Office, where she made a sworn, audio-recorded statement to the District Attorney's office. (PX-7; DX-D; Tr. 46, 203, 437-438.) Based on Creary's photo identification and sworn statement, Detective Braithwaite arrested Harewood on June 11, 2007. (JT ¶ 1.)

Following his arrest, Harewood told Braithwaite that he did not frequent the area of the crime scene. (PX-10; Tr. 225.) Braithwaite believed, however, that Harewood was lying to him because Harewood had been arrested in that very location just three months earlier, and had reported being there soon after the crime and seeing the yellow crime-scene tape from the stabbing. (PX-6; PX-10; Tr. 225, 384-85.) Harewood then told Braithwaite that an associate of his, Paul Gibbs, would vouch for his whereabouts on the day of the stabbing approximately three weeks earlier. (Tr. 269-70, 370, 373.) At trial, Harewood offered as evidence of that alibi only his own testimony that he was at work for his friend Gibbs that day, that he worked part-time, and that his place of employment was approximately 15 blocks from the crime scene. (Tr. at 346, 353, 366, 370-71, 394.)

### III. The Jury's Verdict

#### A. Liability & Damages

On December 6, 2013, at the termination of the liability portion of trial, the jury returned its verdict, finding that Plaintiff proved by a preponderance of the evidence that Braithwaite falsely arrested and unreasonably detained him. (Dkt. 124-1 ("Ct. Ex. 1"), ECF[10] at 1-2.) The jury found that Braithwaite did *not* maliciously prosecute Harewood. (*Id.* at 1.)

On December 9, 2013, following the damages portion of trial, the jury found by a preponderance of the evidence that Harewood was entitled to $25,000 in compensatory damages.

---

[10] Citations to "ECF" pages refer to the page numbering of the Electronic Court Filing ("ECF") system, and not the document's internal page numbers.

Because the jury found that Plaintiff suffered the same injury pursuant to his False Arrest and Unreasonable Detention claims, the jury was not required to state what portion of the $25,000 compensatory was attributable to the false arrest and what portion was attributable to the unreasonable detention. (*See* Dkt. 124-15 ("Ct. Ex. 16"), ECF 1-2.)

### B. Qualified Immunity & the Special Verdict Sheet

Following the procedure outlined by the Second Circuit, the Court presented the questions of liability to the jury, and reserved the question of qualified immunity for the Court to decide post-trial if there was a verdict in Plaintiff's favor. (Tr. 453-54, 747, 844-45, 854, 982);[11] *see Stephenson v. Doe*, 332 F.3d 68, 80 (2d Cir. 2003) ("The court should charge the jury on [plaintiff's § 1983 claim], but not on qualified immunity. If the jury returns a verdict . . . against [plaintiff], the court should then decide the issue of qualified immunity."). Following the verdict in Plaintiff's favor on two counts, the Court presented the jury with a series of factual questions, known as special interrogatories, to aid the Court in its determination of the qualified immunity issue. *See Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (when material facts pertaining to immunity are in dispute, the appropriate procedure is to allow the jury to resolve any disputed facts that are material to the qualified immunity issue, so that the court may make the "ultimate determination of whether the officer's conduct was objectively reasonable. . . .").

---

[11] Plaintiff's procedural argument that Defendant waived his qualified immunity defense by not specifically referring to it in his oral Rule 50(a) motion is unavailing. The parties had previously agreed that the Court would not charge the jury on qualified immunity before its initial deliberations, and would present the special interrogatories if and when the jury rendered a verdict against Defendant. Because, as discussed in the corresponding text above, this procedure is explicitly endorsed by the Second Circuit, Defendant has not waived his right to raise a qualified immunity defense post-trial. *See also, e.g., Guzman v. Jay*, No. 10-CV-6353 ALC JCF, 2014 WL 4767230, at *9 (S.D.N.Y. Sept. 24, 2014). Plaintiff's waiver arguments as to punitive damages (Tr. 843-44) and inconsistent verdicts (Tr. 992-93) are likewise unavailing.

The jury's responses to the special interrogatories are discussed where relevant to Defendant's motion for qualified immunity.

## DISCUSSION

Defendant moves for judgment as matter of law[12] on Plaintiff's successful false arrest and unreasonable detention claims, arguing that the evidence does not support liability and that Defendant is entitled to qualified immunity. In the alternative, Defendant moves for a new trial or to vacate the punitive damages award.

### I.  **Relevant Legal Standards**

#### A. Rule 50 Standard of Review

Rule 50 "generally imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Cash v. Cnty. of Erie,* 654 F.3d 324, 333 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)); *accord Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 149-51 (2000). In making this determination, the court should review the record as a whole but "must draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves,* 530 U.S. at 150-51.

In addition, where, as here, "the jury has deliberated in the case and actually returned its verdict in favor of the non-movant," the moving party's burden is especially heavy. *Cash*, 654 F.3d at 333 (internal citations and quotations omitted). The court must, in these circumstances, "give deference to all credibility determinations and reasonable inferences of the jury" and may

---

[12] Braithwaite previously moved for judgment as a matter of law during the trial proceedings. (Tr. 418-19, 585-86, 596.)

set aside a verdict only if there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 133 (2d Cir. 2008) (internal quotation marks and citation omitted); *accord Kinneary v. City of New York,* 601 F.3d 151, 155 (2d Cir. 2010); *see also Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, 955 F. Supp. 2d 118, 132 (E.D.N.Y. 2013) ("Generally, a court reviewing such a motion must defer to all credibility determinations and reasonable inferences that the jury may have drawn at trial."). Put another way, a court may grant a Rule 50 motion only if, after "viewing the evidence in the light most favorable to the non-movant, [it] concludes that 'a reasonable juror would have been *compelled* to accept the view of the moving party.'" *Cash,* 654 F.3d at 333 (quoting *Zellner*, 494 F.3d at 371) (emphasis in original)).

### B. Qualified Immunity Standards

Qualified immunity protects government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact." *Zellner*, 494 F.3d at 367. The ultimate question of qualified immunity, *i.e.,* whether it was objectively reasonable for the officer to believe that his conduct did not violate a clearly established right, is to be decided by the court. *Id.* However, whether it was objectively reasonable for an officer to believe that his acts did not violate the plaintiff's clearly established rights "has its principal focus on the particular facts of the case." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)

(quoting *Hurlman v. Rice*, 927 F.2d 74, 78-79 (2d Cir. 1991)). Therefore, where facts are in dispute, those "factual questions must be resolved by the factfinder." *Id.*

A court should review the facts that are material to the qualified immunity issue, as resolved by the jury, to determine whether the officer's conduct was objectively reasonable. *Zellner*, 494 F.3d at 368; *see also, e.g., Stephenson*, 332 F.3d at 81 (after the district court receives the jury's decision as to "what the facts were that the officer faced or perceived," the court then may "make the ultimate legal determination of whether qualified immunity attaches on those facts" (citation and quotation marks omitted)); *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir. 1995) (the ultimate question of entitlement to qualified immunity is one of law for the court to decide "[o]nce disputed factual issues are resolved" (internal quotation marks omitted)); *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990) ("If there are unresolved factual issues which prevent an early disposition of the defense, the jury should decide these issues on special interrogatories . . . . The ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully" should be made by the court "on the facts found" by the jury.).

Qualified immunity is an affirmative defense that a defendant bears the burden of proving. *Harlow*, 457 U.S. at 812. "To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question." *Zellner*, 494 F.3d at 368.[13]

---

[13] The Court notes that it provided Defendant ample opportunity to submit and discuss his proposed special interrogatories with the Court, of which the Defendant took full advantage. Indeed, Defendant does not now argue that additional or different questions would alter the result. In any event, the Court took care to present all of Defendant's questions that would allow the jury to resolve "key factual disputes" bearing on the legal determination of qualified

## II.    **False Arrest**

Braithwaite argues that he is entitled to judgment as a matter of law on Plaintiff's false arrest verdict because no reasonable juror could find that Braithwaite lacked probable cause to arrest Harewood.  (Dkt. 143 ("Def. Br.") at 6.)  Similarly, Braithwaite argues that he is entitled to qualified immunity because no reasonable officer in his position would have believed that arresting Harewood would violate Harewood's Fourth Amendment right.

### A.  False Arrest Standards

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted).   Under New York law, to prove the elements of false arrest, a plaintiff must establish that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)).

In typical false arrest cases, "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant*, 101 F.3d at 852).   "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to

---

immunity.  *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 764 (2d Cir. 2003); *cf. Alla v. Verkay*, 979 F. Supp. 2d 349, 370 (E.D.N.Y. 2013) ("The Court had no duty to present interrogatories to the jury that were undisputed and could only confuse or mislead the jury.").

warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* at 84-85 (citing *Weyant*, 101 F.3d at 852); *see also Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010). "A finding of probable cause can be made based on the 'totality of the circumstances.'" *Bernard*, 25 F.3d at 102 (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1982)). Probable cause is evaluated based on the facts available to the officer or officers at the time of the arrest. *Jenkins*, 478 F.3d at 87.

B. Liability – False Arrest

Braithwaite argues that he had probable cause to arrest Harewood, and therefore he did not violate Harewood's Fourth Amendment right. *See Weyant*, 101 F.3d at 852. His argument is straightforward and can be summed up as follows: prior to Harewood's arrest, Creary, an unbiased eyewitness who claims to have seen the stabbing, picked Harewood out of a photo array as the man who had made the "punching motion" into the victim's abdomen during the attack. From there, Defendant cites a number of cases all of which, to varying degrees, stand for the proposition that a witness identification generally provides a police officer with probable cause to arrest the identified individual.

Braithwaite is correct that a photo identification is generally sufficient to establish probable cause. *See, e.g., Celestin v. City of New York,* 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008) ("a positive photo identification by an eyewitness is normally sufficient to establish probable cause.") There are, however, exceptions to this rule. *See, e.g., Celestin*, 581 F. Supp. 2d at 431 (noting that an identification "procedure may be too unreliable to establish probable cause" when, for example, photographs in a photo array bear "no resemblance to the suspect"; "the suspect's image leaps out at the witness due to its prominence, size, or clarity; or the witness is somehow encouraged to select the suspect"); *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir.

2006) (noting that probable cause may not exist if there are doubts as to the witnesses' veracity). The jury found that this case is one such exception.

At trial, Plaintiff presented myriad evidence and argument to support his position that Creary's identification, in light of the surrounding circumstances, did not provide probable cause for Harewood's arrest. Viewing the facts in the light most favorable to Harewood, Harewood did not fit the description of the perpetrator that Creary gave to the police immediately after the incident. Specifically, Creary described the stabber as six to eight inches taller than Harewood's height. Further, Harewood was 42 years old, but Creary referred to the perpetrators as "boys," and the other eyewitness, Holder, described the perpetrators as "in their 20s." (Ct. Ex. 19 ¶ 16.) As discussed further below, the jury found that Creary was neither *credible* (*Id.* ¶ 17) nor reliable (*Id.* ¶ 18) when she identified Harewood. Given these two findings, among other things, the jury concluded that Braithwaite did not have reason to believe that Harewood participated in the attack of Maximin at the time Braithwaite arrested Harewood (*Id.* ¶ 20), and thus the arrest was not supported by probable cause.

In addition, given the jury's finding that Creary's identification of Harewood was not credible, a reasonable juror also could have been troubled by Braithwaite's failure to ask Creary to clarify the inconsistencies in her May 17th and May 24th statements. (Tr. 59.) Specifically, Braithwaite never questioned Creary about her May 17th statement to Detective Murphy that the assailants were "boys" and that the stabber was 6'2", wearing a blue shirt which he took off to reveal a white shirt. Braithwaite never attempted resolve the discrepancy with Holder's May 17th statement that all of the assailants were in their 20s. Braithwaite never attempted to corroborate Creary's identification of Harewood with the other eyewitnesses, Holder, and

Creary's sister, Dell, even though both witnesses provided Braithwaite with their respective addresses. (Tr. 281-86.)

In light of the above, the Court cannot conclude, deferring, as it must, to the "credibility determinations and reasonable inferences of the jury,"[14] that there was "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *See Brady,* 531 F.3d at 133.

C. Qualified Immunity – False Arrest

In determining whether a defendant is entitled to qualified immunity, a court employs a two-pronged analysis that asks (1) "whether the facts that a plaintiff has alleged make out a violation of a constitutional right"; and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson,* 555 U.S. at 232 (internal citations omitted); *see also Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010). Where, as here, the right to be free from unlawful arrest and Braithwaite's violation of such right are already established, qualified immunity turns only on the second prong of the qualified immunity analysis, *i.e.*, whether an objectively reasonable officer faced with the same factual scenario as Braithwaite would have known that arresting Harewood violated Harewood's right to be free from arrest without probable cause. *See Taravella*, 599 F.3d at 133; *Loria v. Gorman*, 306 F.3d 1271, 1281 (2d Cir. 2002); *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "An officer's determination is objectively reasonable if there was "arguable" probable cause at the

---

[14] Indeed, the jury had substantial opportunity to assess the credibility of both Creary and Braithwaite during their extensive testimony at trial. (*See* Tr. at 35-126, 182-344 (Braithwaite); 421-544 (Creary).)

time of arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Jenkins*, 478 F.3d at 87 (quoting *Lennon,* 66 F.3d at 423-24).  In other words, "[a]rguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law." *Zellner*, 494 F.3d at 369.

Braithwaite first argues that no officer would have believed that arresting a suspect based on an unbiased eyewitness's identification violated a constitutional right.  However, Braithwaite has misidentified the right at issue, which is the clearly established right to be free from arrest absent probable cause, not some more specific right to be free from arrest in the face of an unbiased witness identification.  Finding a right clearly established for purposes of qualified immunity "do[es] not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. ——, ——, 131 S.Ct. 2074, 2083 (2011).  As discussed above, Second Circuit precedent has placed the right to be free from false arrest well beyond the point of debate. *See Weyant*, 101 F.3d at 852; *see also Oliveira*, 23 F.3d at 648 ("The right not to be arrested in the absence of probable cause is undoubtedly well-established.").

Second, similar to his argument with respect to liability, Braithwaite contends that he had at least arguable probable cause to arrest Harewood because Creary identified Harewood as the perpetrator of the underlying crime.   As an initial point, context matters.  Braithwaite's decision to arrest Harewood was not instantaneously made under tense circumstances.  Given the three-week gap between the commencement of the investigation and Harewood's arrest, the rationale supporting qualified immunity is at its lowest ebb. *See Lennon*, 66 F.3d at 424 ("The doctrine of

qualified immunity serves to protect police from liability and suit when they are required to make on-the-spot judgments in tense circumstances."). Put another way, the justification for qualified immunity dissipates with time. Here, Braithwaite had time to conduct a thorough investigation, and if he so chose, to reconcile any inconsistencies in the evidence collected. He did not. A fact which, based on its responses to the special interrogatories, was not lost on the jury.

As discussed above, the jury found that Harewood did *not* look like he could have been in his 20s or late 20s at the time of the arrest. (Ct. Ex. 19 ¶ 10.) In addition, the jury found that, prior to arresting Harewood, Braithwaite *had reason to believe* that Creary's photographic identification of Harewood was inaccurate. (*Id.* ¶ 16.) The jury further found that Creary was neither *credible* (*Id.* ¶ 17) nor reliable (*Id.* ¶ 18) when she identified Harewood. The jury ultimately concluded that Braithwaite did not have reason to believe that Harewood participated in the attack of Maximin at the time Braithwaite chose to arrest Harewood. (*Id.* ¶ 20.)

Because the jury's responses to the special interrogatories do not lack evidentiary support, the Court gives full deference to them as "credibility determinations and reasonable inferences of the jury." *Brady*, 531 F.3d at 133. Thus, the only question for the Court to resolve is whether reasonable officers could disagree about the existence of probable cause under the circumstances faced by Braithwaite, *i.e.*, where probable cause was based solely on an incredible, unreliable photographic identification that the officer had reason to believe was inaccurate and had the time and means to further investigate or seek to corroborate. On the facts as the jury found them, the answer is no. Indeed, if the Court were to find qualified immunity here despite the jury's unequivocal responses to the special interrogatories—*e.g.*, that Harewood did not look like a "boy" in his "20's," that Braithwaite *had* reason to believe that Creary's

identification of Harewood was *inaccurate*, and that Braithwaite *did not* have reason to believe that Harewood participated in Maximin stabbing—it would render the special interrogatory process completely meaningless.[15]

Finally, the Court notes that the jury's determination that punitive damages were appropriate in this case makes Braithwaite's assertion of qualified immunity "seem especially hollow." *Adedeji v. Hoder*, 935 F. Supp. 2d 557, 571 (E.D.N.Y. 2013) (quoting *Robertson v. Sullivan*, No. 07–CV–1416, 2010 WL 1930658, at *4 (E.D.N.Y. May 12, 2010)). The jury having found that Braithwaite's conduct was malicious or wanton cuts deeply against Braithwaite's argument that the Court should find him immune on the ground that he acted in objectively reasonable manner. *Id.*; *see also Robertson*, 2010 WL 1930658, at *4 ("The jury having found that each defendant deserved to be punished for engaging in such behavior, it is difficult to fathom the defendants' post-verdict claim that [the Court] should find them immune on the ground that [they] acted in an objectively reasonable manner."); *Corcoran v. Fletcher*, 160 F.Supp.2d 1085, 1090–91 (C.D. Cal. 2001) (finding that "it would be entirely inconsistent" with the jury's finding that defendant "was either malicious or reckless in the denial of [the

---

[15] Plaintiff points out that on interlocutory appeal in this case, the Second Circuit wrote, "[Harewood] argues that Braithwaite deliberately sought to bias Creary's identification which, if true, seriously undermines Braithwaite's contention that he was entitled to qualified immunity on the false arrest claim because he reasonably relied on Creary's identification." *Harewood*, *v.* 508 F. App'x at 62 (2d Cir. 2013). Because the determination of "whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer *at the time of the arrest*[,]" *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (emphasis added), the Court assumes that the Circuit was referring to the *pre*-arrest identification of Harewood, which, if deliberately biased would, of course, undermine Braithwaite's contention that he was entitled to qualified immunity. However, at trial, Harewood presented no evidence that Braithwaite sought to bias Creary's pre-arrest photo identification, and thus the jury was not asked to make such a determination as part of the special interrogatories. Rather, the jury found that Braithwaite took steps to improperly influence Creary's *post*-arrest line-up identification of Harewood. (Ct. Ex. 19 ¶ 21) (finding that Braithwaite took "steps in conducting the June 11, 2007 line-up with [Harewood] for the purpose of improperly influencing Ms. Creary's identification"). This finding is not relevant to the probable cause analysis.

plaintiff's] rights to then conclude that his conduct is entitled to immunity"). Accordingly, the Court finds that qualified immunity does not insulate Braithwaite from the jury's determination that he is liable for false arrest.

## III. Unreasonable Detention

Braithwaite argues that he is entitled to judgment on Harewood's unreasonable detention claim as a matter of law with respect to both liability and qualified immunity. At trial, Harewood's unreasonable detention claim appeared to be premised both on Braithwaite's failure to investigate Harewood's alleged alibi and Braithwaite's improper influencing of Creary's post-arrest line-up identification of Harewood.[16] However, neither of Harewood's theories, as a matter of law, establishes an unreasonable detention claim.

### A. Elements of an Unreasonable Detention Claim

The Second Circuit has found that an unreasonable claim may arise where a police officer fails "to investigate specific, readily-verifiable claims of innocence [made by a detained arrestee] in a reasonable time period." *Russo v. City of Bridgeport,* 479 F.3d 196, 209. To prevail on a claim of excessive detention (or "*Russo* claim"), a plaintiff must demonstrate "(1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct 'shocks the conscience.'" *Russo,* 479 F.3d at 205. The relevant factors to consider in determining whether a plaintiff's Fourth Amendment right to be free from excessive detention was violated are: (1) the length of time the plaintiff was incarcerated; (2) the

---

[16] Post-trial, perhaps due to a lack of supporting evidence on the alibi theory, Plaintiff focuses almost exclusively on the improper line-up procedure to support the verdict with respect to his unreasonable detention claim, arguing that "officers of reasonable competence could not disagree that it was illegal for Braithwaite to improperly influence Creary's line-up identification of Harewood." (Dkt. 145 ("Pl. Br.") at 25; *accord* 39-40 (regarding liability).)

ease with which the exculpatory evidence in the defendant officers' possession could have been checked; and (3) the alleged intentionality of the defendants' behavior. *Id.* at 209-10; *see also Thompson v. City of New York*, 603 F. Supp. 2d 650, 656 (S.D.N.Y. 2009) (a "government officer's indifference to a pretrial detainee's innocence will support a damages award under § 1983 if the plaintiff proves that: (i) he was wrongfully incarcerated for an unreasonable length of time; (ii) the defendant-officer, by expending reasonable cost and effort, could have conclusively established the plaintiff's innocence; (iii) the defendant-officer failed to do so; and (iv) the defendant-officer acted with a culpable mental state–*i.e.*, with intent to unlawfully detain the plaintiff or deliberate indifference to his constitutional rights.").

B. Liability – Unreasonable Detention

The touchstone of an unreasonable detention claim is the existence of egregious conduct by an officer in connection with specific, readily-accessible, exculpatory evidence. At trial, Harewood did not prove that there was objective, readily-verifiable, exculpatory evidence in Braithwaite's possession that would have established Harewood's innocence and shortened his detention.

1. Failure to Investigate Plaintiff's Alibi

With respect to the alibi theory, the only exculpatory evidence that Harewood introduced at trial was his own testimony that he was at work on May 17, 2007. Harewood did not specify the time period during which he was allegedly at work, and testified at trial that his job was "part time" and only "[a]bout 15 blocks" from the crime scene. (Tr. 346, 366, 394.) He also testified that he was "working for a friend." (Tr. 353.)[17] This testimony alone is insufficient

_____

[17] Prior to trial, the Court granted Braithwaite's motion *in limine* to preclude the testimony of Harewood's boss, Gibbs, whose name Harewood had given to Braithwaite to corroborate

to support a finding that Braithwaite's failure to investigate Harewood's alibi "shocks the conscience." *See Russo*, 479 F.3d at 205.

By contrast, in *Russo,* the defendant-officers, during the underlying investigation, hid the only copy of a video surveillance tape that clearly showed that the perpetrator of the robbery in question did not have tattoos on his arms. Russo, whom the police had arrested for the robbery, had arms covered with distinctive tattoos, and repeatedly told the officers that the subject video would demonstrate his innocence. The defendant-officers failed to turn over the exculpatory evidence to either the prosecutor or the defense for a period of over 200 days. The police not only ignored this evidence, but also lied about both having viewed the video and its contents, falsely insisting that it showed a man with tattoos like Russo's. The Circuit held that criminal defendants have a right "to be free from prolonged detention caused by law enforcement officials' mishandling or suppression of exculpatory evidence in a manner which shocks the conscience." *Russo*, 479 F.3d at 211. Thus, the defendant-officers had violated Russo's right against unreasonable detention because (1) the officers possessed "sole custody" of the clearly exculpatory evidence, (2) the officers purposely hid the exculpatory evidence, (3) lied that they had viewed the exculpatory evidence and about its contents, and (4) as a result of the officers' hiding of the clearly exculpatory evidence, the defendant and prosecutor did not receive it for a period of several months. *Russo*, 479 F.3d at 208; *see Wilson v. City of New York*, 480 F. App'x 592, 595 (2d Cir. 2012).

Here, the alibi evidence in question was, at most, only arguably exculpatory and was not in Braithwaite's exclusive possession. At trial, there were no allegations that Braithwaite tampered with or suppressed the alibi evidence. *Russo*, 479 F.3d at 211. To the contrary,

Harewood's alibi, on the basis that Gibbs had refused to appear for a deposition in this case. *See Harewood,* 2013 WL 5366391, at *3-4.

Plaintiff himself possessed the alibi evidence, and was able to *successfully* present it to the grand jury. Moreover, unlike in *Russo*, all of the evidence relied on by Braithwaite and the NYPD in their investigation of the Maximin stabbing was testimonial (*i.e.*, not physical or impeachable), some of which served to identify Harewood as the stabber. *See Wilson v. City of New York*, 480 F. App'x at 595.

A failure to investigate evidence that is only arguably exculpatory does not shock the conscience. *See, e.g., Wilson*, 480 F. App'x. at 595 (distinguishing Russo because, while the evidence in Wilson was conflicting, some of it identified the defendant as an accomplice to the charged crime); *Nelson v. Hernandez*, 524 F. Supp. 2d 212, 225 (E.D.N.Y. 2007) (holding that an officer's conduct did not shock the conscience despite allegedly ignoring a video because the defendant admitted that his attorney was unable to determine whether the video depicted the defendant and was therefore not exculpatory); *Nzegwu v. Friedman*, 2014 WL 1311428, at *13 No. 10-CV-02994 CBA RML (E.D.N.Y. Mar. 31, 2014) (contrasting the case from *Russo* because "where the evidence ignored is only arguably exculpatory, the conduct does not shock the conscience."). Finally, none of the jury's responses to the special interrogatories militate in favor of a finding to the contrary.

2.  Improper Line-Up Procedure

Plaintiff also argues that his unreasonable detention claim was supported by Braithwaite having improperly influenced Creary's line-up identification of Harewood. (Pl. Br. at 25.) There is no doubt that the jury was distressed by the in-person lineup conducted by Braithwaite on June 11, 2007 (Ct. Ex. 19, ¶¶ 21, 22, 24), and appears to have found that his conduct with respect to the line-up "shocked the conscience" as a result. But this finding does not support a verdict on the unreasonable detention claim. As reprehensible as the jury may have found

Braithwaite's conduct, such conduct can only support a *due process violation*, not a Fourth Amendment excessive detention claim. *Wray v. City of New York*, 490 F.3d 189, 193 (2d Cir. 2007) (explaining that a police officer's suggestive lineup is not a constitutional violation; the constitutional violation occurs if evidence produced in an unlawful identification procedure is introduced at trial); *see also, e.g., Thompson*, 603 F. Supp. at 650.[18]  Therefore, the improper line-up alone is insufficient as a matter of law to support an unreasonable detention verdict.[19]

### IV.    Rule 59 – New Trial

Anticipating success with respect to the unreasonable detention claim, Braithwaite submits that, the Court having disposed of such claim, Defendant is entitled to a new trial because "Plaintiff's arguments at trial on the *Russo* claim were prejudicial and irrelevant to the false arrest claim yet tainted the jury's verdict on that claim."  (Def. Br. at 20.)

Under Rule 59(a) of the FRCP, "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."  FRCP 59(a).  In contrast to the standards governing a Rule 50 motion, a court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner" when considering a Rule 59 motion.  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir.

---

[18] With respect to liability, Defendant also argues that Plaintiff introduced no evidence that the length of his incarceration was unreasonably prolonged given that he was released within 5 days of his arrest, after the Grand Jury failed to indict him.  Though that may be true, given the Court's findings, it need not determine whether such a detention can ever be considered unreasonably prolonged.

[19] Although unnecessary in light of the Court's finding that the evidence offered in support of Plaintiff's unreasonable detention claim was legally insufficient, the Court also finds that Braithwaite is entitled to qualified immunity with respect to that claim for substantially the same reasons as discussed.  *See Wilson*, 480 F. App'x. at 595; *Nelson*, 524 F. Supp. 2d at 225; *Nzegwu*, 2014 WL 1311428, at *13; *Wray*, 490 F.3d at 193; *Thompson*, 603 F. Supp. at 650.

2012).  The court must, however, "exercise [its] ability to weigh credibility with caution and great restraint," and "'[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.'"  *Id.* (quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992)).  A motion for a new trial should ordinarily be denied "'unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'"  *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998) (quoting *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir. 1997)); *accord Tesser v. Bd. of Educ.*, 370 F.3d 314, 320 (2d Cir. 2004).

Moreover, challenges to arguments by counsel are subject only to deferential review. *Patterson v. Balsamico*, 44 F. 3d 104, 119 (2d Cir. 2006).  "[A] party seeking a new trial on the basis of opposing counsel's improper statements to the jury faces a heavy burden, as "[r]arely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal." *Marcic v. Reinauer Transp. Companies*, 397 F.3d 120, 124 (2d Cir. 2005) (quoting *Reilly v. Natwest Markets Group, Inc.,* 181 F.3d 253, 271 (2d Cir. 1999)).  Lastly, where, as here, no contemporaneous objection was made to the statements at issue, a new trial should be granted only if the violation was "so serious and flagrant that it goes to the very integrity of the trial."  *Id.* (citations omitted).

Defendant has not specified which statements by Plaintiff's counsel he deems improper. Rather, Defendant makes the global argument that Plaintiff's counsel admitted to the Court— outside the presence of the jury—that Plaintiff presented evidence pertaining to the suggestive lineup "to the jury to support his *Russo* claim, not just his malicious prosecution claim."  (Def. Br. 20.)  Plaintiff was, of course, entitled to present evidence regarding the suggestive lineup, as

it was central to his claim for malicious prosecution.  The fact that Plaintiff's counsel intended it to support another of Plaintiff's claim—which this Court has now disposed of—is of no relevance to the jury's verdict on false arrest.  If the Court were to subscribe to Defendant's argument, any time a court granted a Rule 50 motion with respect to one claim, it would have to grant a new trial as to any other successful claims because evidence of the losing claim could have polluted the jury with respect the winning claim.  Such a result is plainly untenable, especially where, as here, Defendant has failed to identify the statements that purportedly poisoned the jury.

**V.      Punitive Damages**

Defendant argues that Court should vacate Plaintiff's punitive damages award in connection with his false arrest claim because the award is inconsistent with the Jury's special interrogatory findings.  Specifically, Braithwaite points to the following findings of the jury: Braithwaite (1) did not intentionally rig Creary's initial photo array, (2) subjectively believed Creary's photo identification was accurate, and (3) subjectively believed that Harewood participated in the underlying crime.  (Ct. Ex. 19 ¶¶ 11, 15, 19.)  However, these findings do not *necessarily* conflict with a finding that Braithwaite acted with "reckless disregard or indifference" to Harewood's right to be free from false arrest.  As discussed above, the jury found that Creary was neither credible nor reliable when she identified Harewood.  Given these two findings, among other things, the jury concluded that Braithwaite *did not have reason to believe that* Harewood participated in the attack of Maximin at the time of his arrest, and thus the arrest was not supported by probable cause.  (*Id.* ¶¶ 17, 18, 20.)  In other words, for all of the reasons discussed the jury could have found, consistent with the special interrogatory findings upon which Braithwaite relies, that Braithwaite recklessly disregarded or was indifferent to the

evidence demonstrating, or tending to demonstrate, that Braithwaite did not have probable cause to arrest Harewood. *See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."); *see also Finnegan v. Fountain*, 915 F.2d 817, 820 (2d Cir. 1990) (same).

## CONCLUSION

For the foregoing reasons: Defendant's Rule 50 motion is denied with respect to Harewood's false arrest verdict, but is granted as to Harewood's unreasonable detention verdict. Because Harewood suffered the same injuries from his false arrest and unreasonable detention claims, he only recovered a single compensatory amount for both, and thus his $25,000 compensatory damages award shall not be altered. Plaintiff's $20,000 punitive damages award in connection with his false arrest claim stands. However, because Defendant's motion is granted as to Plaintiff's unreasonable detention claim, the $20,000 punitive damages award in connection with that claim is overturned. Thus, Plaintiff will recover a total of $45,000, based on the jury's favorable verdict on his false arrest claim, plus applicable post-judgment interest running from the date judgment is entered. Defendant's Rule 59 motion for a new trial and his motion to vacate the punitive damages award as to the false arrest verdict are denied.

The Clerk of the Court is respectfully directed to enter judgment accordingly and close this case.

SO ORDERED:

   /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: December 5, 2014
      Brooklyn, New York